_____FILED _____ENTERED
_____LOGGED _____RECEIVED

NOV 0 8 2002

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ENTERASYS NETWORKS, INC. | : | |
| | : | |
| v. | : | Civil No. WMN-02-1557 |
| | : | |
| nsgdata.com, INC. | : | |
| | : | |

**MEMORANDUM**

Before the Court is Defendant's Motion to Dismiss, or for
Summary Judgment.  Paper No. 10.[1]  The motion is fully briefed.
Upon a review of the pleadings and the applicable case law, the
Court determines that no hearing is necessary (Local Rule 105.6)
and that Defendant's motion should be denied.

At issue in this suit is whether Defendant nsgdata.com,
Inc.'s re-sale of assets purchased from the bankruptcy estate of
Nx Networks, Inc. infringes on patents owned by Plaintiff
Enterasys Networks, Inc.  The relevant facts are as follows.

On June 5, 2000, Plaintiff's predecessor in interest filed
suit against Nx Network in the United States District Court for
the District of Massachusetts.  The suit alleged that certain
routing and networking equipment made, used, and sold by Nx
Network infringed on various patents owned by Plaintiff's
predecessor in interest.  While this litigation was ongoing, Nx

---

[1] Also before the Court is Plaintiff's Motion for Leave to
File a Sur-Reply, Paper No. 13.  Because the proposed sur-reply
predominately addresses issues raised for the first time in
Defendant's Reply, the motion will be granted.

Network filed a petition for bankruptcy under Chapter 11 of the
Bankruptcy Code in the Bankruptcy Court for the Eastern District
of Virginia. Referencing the Massachusetts patent infringement
suit, Plaintiff filed a claim against the bankruptcy estate "for
an amount not less than $25 million." Proof of Claim of
Enterasys, Networks, Inc., Graham King Affidavit, Exh. B.

Nx Networks subsequently announced the sale of its business
products and services through the bankruptcy auction process. On
February 11, 2002, Nx Networks entered into an Asset Purchase
Agreement with Defendant for the purchase of certain assets which
have been described in the pleadings as a "mass of routing and
switching equipment" (hereinafter, the Purchased Assets). On
March 6, 2002, the Bankruptcy Court entered an order approving
the Asset Purchase Agreement. The order provided, in pertinent
part, that the Purchased Assets would be transferred to
Defendant, "free and clear of all mortgages, security interests,
pledges, liens, claims, interests, judgments, demands,
encumbrances, restrictions or charges of any kind or nature,
fixed or contingent (collectively, the "Liens"), whether arising
prior to or subsequent to the commencement of the Debtor's
Chapter 11 case, and whether imposed by or asserted based on
agreement, understanding, law, equity or otherwise." King
Affidavit, Exh. A at ¶ 5. The order also provided that, all such

Liens would "attach to the sale proceeds in the order of their priority, with the same validity, force and effect which they now have as against the Subject Assets." Id. Plaintiff did not file any objection to, nor did it appeal from, the order of the Bankruptcy Court approving the Asset Purchase Agreement, and its infringement claim remains pending in the bankruptcy proceeding.

Defendant paid the bankruptcy estate the sum of $667,000 for the Purchased Assets, and also agreed to make significant additional payments over time. Upon taking possession of those assets, Defendant announced on its website, and presumably through other means, that it would continue selling and supporting the Purchased Assets. Defendant acknowledges that it has, indeed, commenced the sale of those Purchased Assets.

Plaintiff brought this action alleging that Defendant is "making, using, offering for sale and/or selling voice and data gateway switches, routers and other networking products" that infringe on various patents held by Plaintiff. Complaint at ¶ 11. In moving to dismiss the Complaint, Defendant argues that this action is barred because, under the terms of the Bankruptcy Court's order, the alleged infringing products were all purchased "free and clear" of all "interests."

The Bankruptcy Court's March 6, 2002 order was issued pursuant to § 363(f) of the Bankruptcy Code. Section 363(f)

3

provides, in pertinent part, that a trustee or debtor-in-possession may sell property of the bankruptcy estate,

> free and clear of any <u>interest in such property</u> of an entity other than the estate, only if
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> . . . .
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (emphasis added).

Courts have provided surprisingly little guidance as to the scope of the phrase "interest in such property." In the Fourth Circuit's most recent published decision interpreting this section, the court observed that "the precise boundaries of the phrase likely will be defined only as the courts continue to apply it to the facts presented in the cases brought before them." <u>In re Leckie Smokeless Coal Company</u>, 99 F.3d 573 (4th Cir. 1996). The <u>Leckie</u> decision, however, did provide some general boundaries. After reviewing the various approaches taken by different courts, the court rejected as too narrow the interpretation that § 363(f) only allowed for sales free and

clear of "in rem interests which have attached to the property."
Leckie, 99 F.3d at 582 (citing In re: Fairchild Aircraft Corp.,
184 B.R. 910, 917-19 (Bankr. W. D. Tex. 1995)).  On the other
end of the spectrum, however, the court also rejected the "unduly
broad interpretation of the statute . . . that one has an
interest in a debtor's property simply when one has a right to
demand money from the debtor."  Leckie, 99 F.3d at 582.

The Fourth Circuit's ultimate holding in Leckie, however,
provides perhaps more guidance than the above quoted language.
In Leckie, the property at issue was the assets of several debtor
coal mining operators.  The interests at issue were future Coal
Act premiums[2] which would be owed by the debtor coal companies to
employee benefit plans.  In concluding that the debtors' assets
could be sold free and clear of the debtors' Coal Act
obligations, the court reasoned:

> we hold that the Fund's and Plan's rights to
> collect premium payments from [the debtors]
> constitute interests in the assets that [the
> debtors] now wish to sell, or have sold
> already.  Those rights are grounded, at least
> in part, in the fact that those very assets
> have been employed for coal-mining purposes:
> if [the debtors] had never elected to put
> their assets to use in the coal-mining
> industry, and had taken up business in an
> altogether different area, the Plan and Fund
> would have no right to seek premium payments

_____

[2] The Coal Act, 26 U.S.C. § 9701-9722, established a system
whereby coal operators were required to pay for the benefits
provided to its own retirees, as well as to share in the costs of
providing benefits to "orphaned retirees," i.e., retirees whose
former employer had gone out of business.

> from them. Because there is therefore a
> relationship between (1) the Fund's and
> Plan's rights to demand premium payments from
> [the debtors] and (2) the use to which [the
> debtors] put their assets, we find that the
> Fund and Plan have interests in those assets
> within the meaning of section 363(f).

Leckie, 99 F.3d at 582. As one commentator noted, the Fourth
Circuit's recognition that the relationship between the use of
the coal companies' assets and the obligation to pay benefit
premiums was a sufficient basis upon which to find an "interest
in the property" is indicative of "the trend . . . in favor of a
broader definition [of 'interest'] that encompasses other
obligations that may flow from ownership of the property." L.
King, Collier on Bankruptcy (15ᵗʰ ed. rev.)(citing Leckie).

In light of the Fourth Circuit's broad interpretation and
application in Leckie of the phrase "interests in such property,"
this Court has no difficulty concluding that Plaintiff's patent
infringement claims are sufficiently related to the Purchased
Assets that they could be sold free and clear pursuant to a §
363(f) order. Certainly, the relationship between a "mass of
routing and switching equipment" that allegedly infringes on
Plaintiff's patents and Plaintiff's patent infringement claims
themselves is as strong as the relationship between the coal
operator's assets and the operator's future Coal Act obligations
in Leckie. Leckie also teaches that the fact that a debtor's

6

obligation has some future or inchoate aspect to it does not rule out the possibility that the assets can be sold free and clear of that obligation.[3]

The parties have not identified and the Court's own research has not revealed any reported decision specifically addressing whether patent infringement claims are "interests in property" within the meaning of § 363(f). The Court notes that there are reported decisions in which courts have upheld bankruptcy orders which confirmed sales of debtors' assets free and clear of creditors' patent infringement claims. Those decisions, however, arose under procedural postures that did not require the courts

_____

[3] Plaintiff relies on Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716 (N.D. Ind. 1996), for the proposition that a section 363(f) sale order cannot include "future claims that did not arise until after bankruptcy proceedings concluded." Opp. at 15. Aside from the fact that Ninth Avenue was decided under Seventh Circuit precedent that, on this issue, is more restrictive than that of the Fourth Circuit, the actual holding of the court does not support Plaintiff's position. In Ninth Avenue, the plaintiff was seeking contribution for environmental clean up costs under CERCLA from the owner of property purchased pursuant to a § 363(f) sale order. The plaintiff was unaware of, and did not participate in, the bankruptcy proceedings. The court did not rule out the possibility that the bankruptcy order discharged the liability for the clean up, it simply held that the record was insufficient to determine "whether the potential CERCLA claimant ha[d] sufficient information to give rise to a claim or contingent CERCLA claim before the consummation date of the bankruptcy." 195 B.R. 716.

In the instant action, there is no dispute that Plaintiff was aware of a potential infringement claim related to the Purchased Assets well before the bankruptcy proceedings commenced.

7

specifically to address the scope of § 363(f). For example, In re Vetter Corporation, 724 F.2d 52 (7th Cir. 1983), involved the claims of a patent holder who filed suit against the manufacturer of motorcycle parts and accessories. The patent holder maintained that this manufacturer's motorcycle radio housings, and the molds used to manufacture those housings, infringed on its patents. Two years later and while the patent litigation was ongoing, the manufacturer filed for bankruptcy under Chapter 11 and also filed an application to sell its assets under § 363(f).

At the sale hearing, the patent holder raised an objection to the sale of the radio housings and molds but the bankruptcy court issued an order authorizing the sale over that objection. The district court then approved that order. The patent holder filed an appeal, arguing that the bankruptcy court erred by refusing to withhold from the "free and clear" sale that portion of the assets that included the alleged infringing radio housings and molds. The patent holder failed, however, to move to stay the sale pending appeal. In the absence of such a stay, the sale was consummated and the assets transferred. On appeal, the Seventh Circuit held that the failure to obtain a stay of the sale rendered the appeal moot. 724 F.2d at 57.

A similar scenario played out in In re Whistler Corp., 243 B.R. 573 (D. Mass. 2000). In Whistler, the manufacturer of radar

8

detection and other products filed for bankruptcy and moved to
sell its radar division. A party that had a pending patent
infringement suit related to the products that the debtor wished
to sell objected to the motion, arguing that the bankruptcy court
could not authorize the sale of the radar division free and clear
of its patent infringement claims. Over that objection, the free
and clear sale was approved and consummated. Although the party
with the patent claim appealed the sales order to the district
court, it did not move for a stay. Like the Seventh Circuit in
Vetter, the court held that, absent such a stay, the appeal was
moot. 243 B.R. at 574.

While the decisions in Vetter and Whistler do not directly
answer the question before this Court, they do undermine the
concern that forms the crux of Plaintiff's argument. Plaintiff
asserts that allowing the Purchased Assets to be sold free and
clear "would effectively allow any infringer to escape liability
merely by passing infringing products through a bankruptcy sale."
Opp. at 2. Vetter and Whistler illustrate that the patent
holders are not without recourse and have opportunities within
the bankruptcy proceedings through which to challenge the sale of
products that they contend infringe on their patents. While well
aware of the pending sale of the allegedly infringing assets,
Plaintiff neither objected to the sale nor appealed the free and

9

clear order, nor sought a stay of that order. Thus, Plaintiff would appear to be in an even weaker position than the patent holders in <u>Vetter</u> and <u>Whistle</u>. Furthermore, Plaintiff's argument ignores the fact that under the terms of the bankruptcy sale order, a lien attached to the proceeds of the sale of the Purchased Assets, and Plaintiff still has a claim in bankruptcy against that considerable sum.

For these reasons, the Court finds, as a matter of law, that Plaintiff's infringement claim arising out of any re-sale of the Purchased Assets is barred by the Bankruptcy Court's order of March 6, 2002. That finding does not resolve the entire action, however. Plaintiff is correct that there is the need to distinguish between its claims against Defendant for Defendant's use and sale of the existing inventory that it purchased from Nx Networks and Defendant's future manufacture of new products. The Complaint appears to encompass both. <u>See</u> Complaint at ¶ 11 (alleging that Defendant is "<u>making</u>, using, offering for sale and/or selling" equipment that embody the Plaintiff's inventions)(emphasis added). By purchasing the existing "mass of routing and switching equipment," Defendant did not obtain a continuing right to make, sell or use new routing and switching equipment. To the extent that discovery reveals that Defendant has manufactured new equipment or purchased new equipment from

10

other sources, that new equipment potentially could be subject to Plaintiff's infringement claims.   Therefore, the Court will deny Defendant's motion to dismiss and allow discovery to proceed on this issue.[4]

        A separate order consistent with this memorandum will issue.


                                    _William M. Nickerson_
                                    William M. Nickerson
                                    Senior United States District Judge


Dated: November 8 , 2002.

---

        [4] Defendant's motion is a motion to dismiss, or in the alternative, for summary judgment.   Because the Bankruptcy Order is a matter in the public record, the Court could take judicial notice of that order without converting the motion to one for summary judgment.   Defendant, however, submitted an affidavit of its president in which he stated that "nsgdata has not independently manufactured or produced" any products referred to in the Complaint.   King Affidavit at ¶ 6.   Plaintiff, in response, urged the Court not to consider this affidavit and convert the motion to one pursuant to Rule 56 without first giving Plaintiff the opportunity to conduct discovery as to Defendant's conduct beyond the simple re-sale of the Purchased Assets.   Plaintiff submitted a Rule 56(f) affidavit from counsel, explaining the need for such discovery, supported by press releases from Defendant that at least raise some question as to whether Defendant is producing, or intends to produce, additional products similar to those purchased from Nx Networks.   Finding that Plaintiff has met its burden under Rule 56(f), the Court will deny the motion to dismiss, without converting it to a motion for summary judgment, and will allow this action to proceed into discovery.

                                    11